# United States Court of Appeals
## For the First Circuit

No. 23-1286

LAWRENCE GENERAL HOSPITAL,

Plaintiff, Appellant,

v.

CONTINENTAL CASUALTY COMPANY,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Gelpí, Howard, and Rikelman,
Circuit Judges.

Roman Martinez, with whom Robert J. Gilbert, Michael Huggins, David A. Barrett, Margaret A. Upshaw, and Latham & Watkins LLP were on brief, for appellant.

Kannon K. Shanmugam, with whom H. Christopher Boehning, Matthew M. Higgins, Brian M. Lipshutz, Kenneth N. Thayer, Paul, Weiss, Rifkind, Wharton & Garrison LLP, and Conn Kavanaugh Rosenthal Peisch & Ford, LLP were on brief, for appellee.

January 10, 2024

**RIKELMAN, <u>Circuit Judge</u>.**  Lawrence General Hospital ("LGH") sued its insurer, Continental Casualty Company, for denying coverage for losses LGH alleges it suffered during the COVID-19 pandemic.  Relying on recent decisions rejecting similar claims, the district court granted Continental's motion to dismiss LGH's complaint under Federal Rule of Civil Procedure 12(b)(6).  On appeal, LGH contends that the district court misconstrued the critical case law and that the detailed allegations in its complaint are sufficient to state a claim for two different types of coverage under its policy.  First, LGH argues that the policy provisions covering "direct physical loss of or damage to property," associated business-interruption losses, and related expenses should apply because the SARS-CoV-2 virus chemically bonded with its property, resulting in physical damage.  Second, LGH contends its separately purchased Health Care Endorsement covers losses and costs incurred as a result of complying with government decontamination orders related to COVID-19.  Applying Massachusetts state law, we find that LGH failed to state a claim that the SARS-CoV-2 virus caused "direct physical loss of or damage to [its] property."  However, because we conclude that LGH was subject to decontamination orders and thus states a claim for coverage under the Health Care Endorsement, we affirm in part, reverse in part, and remand for further proceedings.

## I.  BACKGROUND

### A. Relevant Facts

We "draw the facts from the complaint and its attachments," taking the well-pleaded facts as true and construing all reasonable inferences in LGH's favor.  Lanza v. Fin. Indus. Regul. Auth., 953 F.3d 159, 161 (1st Cir. 2020); Barchock v. CVS Health Corp., 886 F.3d 43, 48 (1st Cir. 2018).

### 1. LGH's Insurance Policy

LGH is a nonprofit community hospital operating in northeastern Massachusetts and southern New Hampshire.  It has its main campus at the eponymous Lawrence General Hospital in Lawrence, Massachusetts but also operates various other ambulatory surgery centers, family health centers, outpatient rehabilitation centers, and laboratories in the region.  LGH purchased an "all risk" commercial property insurance policy ("the policy") from Continental for the period of October 1, 2019, through October 1, 2020.  The policy includes two types of coverage at issue in this appeal.

First, the policy provides broad coverage for "direct physical loss of or damage to property."  This coverage includes the value of the lost or damaged property itself, as well as related losses.  The "Business Interruption" provision insures against "loss resulting from [the] necessary interruption of [the] business caused by direct physical loss of or damage to covered

property" during the time necessary to "rebuild, repair or replace" the property. The "Extra Expense" provision covers "the reasonable and necessary extra expense . . . incurred by the Insured in order to continue as nearly as practicable the **normal** operation of the Insured's business following direct physical loss of or damage to covered property by perils(s) [sic] insured against." The policy provides primary coverage of up to $563 million for "direct physical loss of or damage to covered property."

Second, LGH purchased an additional Health Care Endorsement, which includes "Disease Contamination Coverage." This coverage is triggered by an "evacuation or decontamination order at a [covered] location by the National Center [sic] for Disease Control, authorized public health official or governmental authority because of the discovery or suspicion of a communicable disease or the threat of the spread of a communicable disease." (Emphasis omitted.) Continental will pay for "direct physical loss of or damage to covered property," a variety of "necessary and reasonable costs," and lost business income "due to the evacuation and decontamination order." Under the Health Care Endorsement, the policy provides coverage of up to $1 million per occurrence. LGH alleges that it was subject to many occurrences triggering coverage under the endorsement.

- 4 -

## 2. The COVID-19 Pandemic and LGH's Response

During early 2020, in the middle of the policy period, the SARS-CoV-2 virus spread throughout the United States, leading quickly to tens of thousands of cases of COVID-19.[1]  The city of Lawrence experienced some of the highest rates of COVID-19 infection in the Commonwealth, and LGH served as the main COVID-19 treatment facility in the region.

In its complaint, LGH alleges that it suffered physical loss of and damage to its property due to the "continuous reintroduction" of SARS-CoV-2 particles.  Relying on expert testimony, LGH alleges that through a process called "adsorption" SARS-CoV-2 particles create "an actual [noncovalent] chemical bond" with the surface of the objects they land on, causing structural changes to the objects themselves and making the virus "hard to detach."  LGH distinguishes between SARS-CoV-2 particles that are merely "deposited" on an object, "akin to spilled flour," and adsorbed particles which "adhere[] to the surface of the adsorbing object and concentrate[] there."

However, LGH also alleges that the nature of the bond between SARS-CoV-2 particles and physical objects "varies, often markedly so, depending on the type of object."  For example, LGH

---

[1] Like the parties, we distinguish between the disease, COVID-19, and the virus that causes it, SARS-CoV-2.

contends that "the properties of the host surface can affect whether an adhered (deposited, adsorbed, or somewhere in between) viral particle remains stuck to the surface and, if so, whether it retains its infectivity." As for the bond's duration, LGH alleges that some studies have found the SARS-CoV-2 virus remains infectious for seven days on surfaces such as plastic, stainless steel, glass, and wood; other studies have found SARS-CoV-2 may remain infectious on glass and stainless steel for approximately a month under indoor conditions.

As a result of this contamination, LGH alleges that it was forced to undertake a series of remediation efforts including: "enhanced cleaning" using "stronger (and more expensive and time-consuming) cleaning products and techniques"; extensive testing, cleaning, and maintenance of HVAC systems, including replacement of HEPA filters; and sterilization or disposal of items such as "intravenous therapy (IV) poles, medical gas, linens, toilet paper, and food."

### 3. Alleged Decontamination Orders

Additionally, LGH alleges that it was subject to several government decontamination orders sufficient to trigger the Disease Contamination Coverage provision. On March 11, 2020, the World Health Organization declared the global COVID-19 outbreak a pandemic. Both the federal government and Massachusetts quickly

- 6 -

reacted to the news by each declaring a COVID-19 state of emergency.

LGH points to directives from the Massachusetts Department of Public Health (DPH) and Centers for Disease Control (CDC) as representative examples of COVID-19 decontamination orders. On March 15, 2020, DPH issued a memorandum requiring hospitals to postpone or cancel all nonessential, elective invasive procedures until the state of emergency was lifted. "[N]onessential, elective invasive procedures" were defined broadly as "procedures that are scheduled in advance because the procedure does not involve a medical emergency." On May 18, 2020, DPH issued an updated memorandum authorizing hospitals to resume a subset of invasive, elective procedures, including cancer screenings and organ transplants, if the hospitals both met and attested to compliance with specific safety standards outlined in the DPH "Reopen Approach for Acute Care Hospitals guidance." The Reopen Approach required, for example, that hospitals "have an established plan for thorough cleaning and disinfection of all common and procedural areas, including in-between patient encounters in treatment rooms, which may require hiring environmental services staff and reducing patient hours to allow for more frequent cleaning." If a hospital failed to meet the stated safety standards, the Reopen Approach warned that the hospital must "promptly suspend provision of non-emergent Phase 1

services," including "nonessential, elective invasive" surgical procedures. DPH also warned it would "monitor and assess compliance," requiring "remedial action or suspension of [Phase 1] procedures and services as warranted."

On June 8, 2020, DPH issued a new memorandum authorizing hospitals to resume "elective, non-urgent procedures and services," again subject to certain mandatory conditions. These conditions included compliance with the previously stated safety standards, as well as "[o]ngoing compliance with CDC requirements and other public health guidance regarding environmental infection controls," including "thorough cleaning and disinfection of [patient] room[s] and equipment." LGH alleges that, by reference, the June 8 order made mandatory a variety of CDC directives. As an example, LGH cites the CDC's September 2020 publication "Guidance for Cleaning and Disinfecting Public Spaces, Workplaces, Businesses, Schools, and Homes," which included suggestions on using Environmental Protection Agency-approved cleaning products, regularly disinfecting high-touch areas, and ensuring the use of appropriate personal protective equipment when using disinfectants and chemicals.[2]

---

[2] LGH also cites as mandatory the CDC's June 2021 guidance on ventilation system upgrades. However, this document was issued well after the October 2019-October 2020 policy period, and it is not clear -- nor does LGH explain -- why this guidance would be a

## B. Procedural History

On April 8, 2020, LGH filed a claim with Continental for coverage of COVID-19 losses beginning on March 16, 2020. After Continental denied coverage, LGH sued in Massachusetts Superior Court, bringing solely Massachusetts state-law claims. Continental then removed the case on the basis of diversity jurisdiction under 28 U.S.C. § 1332 to the District of Massachusetts.

Now in federal court, LGH filed an amended complaint to attempt to satisfy the legal requirements specified in three recently decided cases: Verveine Corp. v. Strathmore Insurance Co., 184 N.E.3d 1266 (Mass. 2022); SAS International, Ltd. v. General Star Indemnity Co., 36 F.4th 23 (1st Cir. 2022); and Legal Sea Foods, LLC v. Strathmore Insurance Co., 36 F.4th 29 (1st Cir. 2022). Continental moved to dismiss the amended complaint for failure to state a claim, and on February 24, 2023, the district court granted the motion to dismiss. LGH timely appealed.

## II. STANDARD OF REVIEW

We review de novo a district court's decision to grant a motion to dismiss under Rule 12(b)(6), reversing the dismissal only if "the combined allegations, taken as true . . . state a

---

binding decontamination order under the policy. As such, we do not consider it in our analysis.

plausible, not a merely conceivable, case for relief."  Lee v. Conagra Brands, Inc., 958 F.3d 70, 74 (1st Cir. 2020) (quoting Sepúlveda-Villarini v. Dep't of Educ. of P.R., 628 F.3d 25, 29 (1st Cir. 2010)).  To determine if the plaintiff's allegations are plausible, we "separate factual allegations from conclusory ones."  Conformis, Inc. v. Aetna, Inc., 58 F.4th 517, 528 (1st Cir. 2023) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678-79 (2009)).  We then "accept as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences therefrom in the pleader's favor."  Lanza, 953 F.3d at 162 (quoting Nystedt v. Nigro, 700 F.3d 25, 30 (1st Cir. 2012)).

### III. DISCUSSION

#### A. Interpreting Insurance Contracts

As this case is in federal court by virtue of diversity jurisdiction, state law provides the substantive rules of our decision.  See Torres-Ronda v. Nationwide Mut. Ins. Co., 18 F.4th 80, 84 (1st Cir. 2021); Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938).  The parties agree that Massachusetts law governs the policy, so we endeavor to predict how the Commonwealth's highest court would decide this case, regardless of whether our independent analysis would suggest a different outcome.  See Aubee v. Selene Fin. LP, 56 F.4th 1, 4 (1st Cir. 2022).

Massachusetts courts construe the language of an insurance policy as a matter of law, applying many of the usual

- 10 -

rules for interpreting contracts. Verveine, 184 N.E.3d at 1272; Valley Forge Ins. Co. v. Field, 670 F.3d 93, 97 (1st Cir. 2012) (applying Massachusetts law). That, of course, means beginning with the "actual language of the polic[y]." Brazas Sporting Arms, Inc. v. Am. Empire Surplus Lines Ins. Co., 220 F.3d 1, 4 (1st Cir. 2000) (applying Massachusetts law).

Under Massachusetts law, we interpret "the words of the policy in their usual and ordinary sense." Verveine, 184 N.E.3d at 1272 (quoting Citation Ins. Co. v. Gomez, 688 N.E.2d 951, 952-53 (Mass. 1998)). This analysis requires that we determine "the fair meaning of the language used, as applied to the subject matter." Id. (quoting Gordon v. Safety Ins. Co., 632 N.E.2d 1187, 1189 (Mass. 1994)). And that means interpreting the policy "in a reasonable and practical way, consistent with its language, background, and purpose." See Gen. Hosp. Corp. v. Esoterix Genetic Lab'ys, LLC, 16 F.4th 304, 308 (1st Cir. 2021) (citation omitted) (applying Massachusetts law). We also consider "what an objectively reasonable insured, reading the relevant policy language, would expect to be covered." Verveine, 184 N.E.3d at 1272 (quoting Dorchester Mut. Ins. Co. v. Krusell, 150 N.E.3d 731, 738 (Mass. 2020)); Brazas Sporting Arms, 220 F.3d at 4 (citation omitted).

A term or phrase in an insurance policy is ambiguous only if "it is susceptible of more than one meaning and reasonably

intelligent persons [could disagree on] which meaning is the proper one." Verveine, 184 N.E.3d at 1272 (quoting Dorchester Mut. Ins., 150 N.E.3d at 738). A court will not find ambiguity merely because "the parties offer different interpretations of the policy language," Scottsdale Ins. Co. v. Torres, 561 F.3d 74, 77 (1st Cir. 2009), or there are "multiple dictionary definitions of a word." Citation Ins. Co., 688 N.E.2d at 953. If a term or phrase in an insurance policy is reasonably susceptible of more than one meaning, it is "strictly construed against the insurer" and in favor of the insured. Easthampton Congregational Church v. Church Mut. Ins. Co., 916 F.3d 86, 92 (1st Cir. 2019) (citing Metro. Prop. & Cas. Ins. Co. v. Morrison, 951 N.E.2d 662, 671 (Mass. 2011)).

With these principles in mind, we turn to LGH's policy.

## B. "Direct Physical Loss of or Damage to Property"

LGH contends it adequately alleged that SARS-CoV-2 chemically bonded with its property, resulting in physical alteration that qualifies as direct physical loss or damage under the policy, and the district court therefore erred in dismissing this claim. We evaluate LGH's argument under a trio of insurance cases decided under Massachusetts law interpreting "direct physical loss of or damage to property" in the context of the COVID-19 pandemic. See Verveine, 184 N.E.3d 1266; SAS, 36 F.4th 23; Legal Sea Foods, 36 F.4th 29. Based on this precedent, we conclude that we must affirm the district court.

- 12 -

We begin with a discussion of these three critical cases. In Verveine, Boston-area restaurants challenged the denial of their commercial insurance claims for lost revenue from the COVID-19 pandemic and resulting government restrictions. 184 N.E.3d at 1270-71. The policies at issue covered "direct physical loss of or damage to" the insured premises as well as lost business income and extra expenses sustained due to suspension of operations "caused by direct physical loss of or damage to property at [the insured premises]." Id. at 1273 (emphasis omitted). The Massachusetts Supreme Judicial Court ("SJC") upheld the dismissal of the restaurants' complaint under its state equivalent to Federal Rule 12(b)(6). Id. at 1270.

Most importantly, Verveine held that property does not sustain physical loss or damage "in the first place unless there needs to be active repair or remediation measures to correct the claimed damage or the business must move to a new location." Id. at 1275 (emphasis added) (citing Sandy Point Dental, P.C. v. Cincinnati Ins. Co., 20 F.4th 327, 333 (7th Cir. 2021)). That is because "'direct physical loss of or damage to' property requires some 'distinct, demonstrable, physical alteration of the property,'" id. (quoting 10A Jordan R. Plitt et al., Couch on Insurance § 148:46 (3d ed. 2016)), and of course property cannot repair itself. The SJC explained that "saturation, ingraining, or infiltration of a substance into the materials of a building or

- 13 -

persistent pollution of a premises requiring active remediation efforts is sufficient to constitute 'direct physical loss of or damage to property.'" Id. at 1276. By contrast, the "[e]vanescent presence of a harmful airborne substance that will quickly dissipate on its own, or surface-level contamination that can be removed by simple cleaning, does not physically alter or affect property." Id. Applying this standard, the SJC held that the restaurants' losses from COVID-19 related closures were "not in any way attributable to a direct physical effect on the plaintiffs' property that can be described as loss or damage." Id. To the contrary, the court stated, the restaurants' "continuing ability to provide takeout and other services" demonstrated that there were no physical effects on the restaurants' property itself, and consequently the alleged "presence" of the virus would either "dissipate on its own" or be removed "by simple cleaning." Id.

Shortly after Verveine was decided, our court applied its reasoning in two opinions issued on the same day. Both cases involved an appeal from a Rule 12(b)(6) dismissal for claims virtually identical to those in Verveine: alleged wrongful denial of commercial property insurance coverage for losses related to the COVID-19 pandemic. SAS, 36 F.4th at 24-25; Legal Sea Foods, 36 F.4th at 30-31. However, both complaints involved slightly more detailed allegations than those in Verveine. SAS alleged that "smaller aerosol droplets carrying SARS-CoV-2 can linger in

- 14 -

the air for hours and can be pulled into air circulation systems and spread to other areas in a building"; "SARS-CoV-2 can linger on surfaces for up to 28 days, serving as a vehicle for viral transmission during that timespan"; and that the virus "cannot simply be removed with disinfectant because it is continually spread and reintroduced." SAS, 36 F.4th at 27-28 (internal quotation marks omitted). Legal Sea Foods alleged that the virus "attach[ed] to surfaces on and within . . . insured property and [hung] in the air," resulting in "losses attributable to governmental closure orders and losses due to the actual presence of the SARS-CoV-2 virus at Legal's restaurants," requiring "increase[d] frequency of cleaning" at those restaurants. Legal Sea Foods, 36 F.4th at 32, 35-36 (alterations in original).

Nonetheless, relying on Verveine, we found that the allegations in both complaints amounted to no more than an "[e]vanescent presence of a harmful airborne substance that will quickly dissipate on its own, or surface-level contamination that c[ould] be removed by simple cleaning." SAS, 36 F.4th at 27-28 (first alteration in original) (citing 184 N.E.3d at 1276); Legal Sea Foods, 36 F.4th at 34-36 (same). Regarding the spread of SARS-CoV-2 through the air, we explained that "we do not see a reason for concluding that the SJC would view Legal's allegations concerning the virus's circulation and hours-long persistence in the air as establishing more than '[e]vanescent presence.'" Legal

- 15 -

Sea Foods, 36 F.4th at 36. As to the allegations about SARS-CoV-2 contamination lasting "for up to 28 days," we found "no allegation that the virus cannot 'be removed by simple cleaning.'" SAS, 36 F.4th at 27-28. In evaluating the alleged remediation efforts, we explained that the SJC's invocation of the phrase "simple cleaning" referred to "the intensity of remediation measures that would be required to remove a droplet." Legal Sea Foods, 36 F.4th at 36. Given that Legal Sea Foods alleged only "increase[d] frequency of cleaning," we saw "nothing . . . in Legal's complaint that would provide a basis for concluding that Verveine can be distinguished from the case before us on such a basis." Id.

Turning to the arguments here, LGH contends that its property damage claim is sufficient to survive a Rule 12(b)(6) motion because the allegations in its complaint are materially different from those in Verveine, SAS, and Legal Sea Foods. In particular, LGH alleges that SARS-CoV-2 physically altered the structure of its property through a process called "adsorption," which it argues is sufficient to establish direct physical loss or damage under Verveine. LGH further contends that the physically altered property was then unsafe because "[h]umans can become infected by touching . . . an object to which viral particles have attached." It notes that, in Verveine, the SJC favorably cited cases where ammonia, gasoline, and noxious odors constituted physical loss or damage. See 184 N.E.3d at 1276. According to

- 16 -

LGH, in those cases, just like here, the property was unsafe because of the potential harm to people from being inside it, even though there was no structural issue with the property itself.

As a result of this newly dangerous property, LGH argues, it undertook substantial remediation efforts that went beyond "simple cleaning." Given these efforts and LGH's allegation that the virus may remain on surfaces for up to a month, it contends the district court erred by dismissing its claim. In support, LGH cites our opinions in SAS and Legal Sea Foods, where we suggested that the presence of a virus on a surface for twenty-eight days may be too long to be deemed "evanescent" and then focused on the lack of allegations in those cases of any remediation efforts beyond "simple cleaning." SAS, 36 F.4th at 28 ("But, even if the presence of the virus on a surface for 28 days is too long to be deemed 'evanescent,' SAS makes no allegation that the virus cannot 'be removed by simple cleaning.'" (citation omitted)); Legal Sea Foods, 36 F.4th at 36 ("Even if a period of 28 days is too long to be 'evanescent,' Legal has not alleged the virus cannot 'be removed by simple cleaning,' as it alleges only that it has had to 'increase frequency of cleaning' in its restaurants.").

Even accepting all LGH's allegations as true, we conclude that we must reject its arguments for three reasons. First, the central holding of Verveine, as applied to this case, is that property cannot repair itself and thus "direct physical

- 17 -

loss of or damage to property" exists only if a party must take active efforts to repair it. 184 N.E.3d at 1275. We read this to mean that even "distinct, demonstrable, physical alteration" of property that will resolve of its own accord, without the aid of remediation efforts, is not "direct physical loss of or damage to property" under Massachusetts law. Id. Moreover, we read the SJC's discussion of "evanescent presence" as an illustration of its central holding: "direct physical loss of or damage to property" occurs only when "active remediation measures" to correct the claimed damage are necessary. Id. at 1276. Both "evanescent presence" and its inverse, "saturation, ingraining, or infiltration of a substance" into property, serve as demonstrations of this holding, not as a separate test of "direct physical loss or damage." Id. Nothing in our opinions in SAS and Legal Sea Foods suggests otherwise.

Taking as true LGH's allegation that SARS-CoV-2 particles can physically alter the affected property through adsorption, LGH's complaint still makes clear that, absent any intervention by it whatsoever, SARS-CoV-2 particles dissipate or become noninfectious within as little as seven to twenty-eight days. Any "damage" that can fix itself without further intervention, and certainly within a period as short as twenty-eight days or less, cannot amount to "direct physical loss of or damage to property" under Massachusetts law as explained in

- 18 -

Verveine.  Therefore, even if LGH did undertake remediation efforts that amounted to more than "simple cleaning," those efforts were not to address any "direct physical loss of or damage to property."

Second, this case is distinguishable from the cases discussed by the SJC about ammonia release, persistent odor, or gasoline contamination where "direct physical loss of or damage to property" was found.  See Verveine, 184 N.E.3d at 1276 (first citing Gregory Packaging, Inc. v. Travelers Prop. Cas. Co. of Am., No. 2:12-cv-04418, 2014 WL 6675934, at *1 (D.N.J. Nov. 25, 2014) (ammonia release requiring outside remediation company to reduce levels in building low enough for safe occupancy inflicted direct physical loss or damage); then citing W. Fire Ins. Co. v. First Presbyterian Church, 437 P.2d 52, 53-55 (Colo. 1968) (gasoline-infiltrated soil and vapors contaminated foundation, halls, and rooms); and then citing Farmers Ins. Co. of Ore. v. Trutanich, 858 P.2d 1332, 1335-36 (Or. Ct. App. 1993) (persistent odor in residence from methamphetamine production constituted physical damage, and therefore cost of remediation was recoverable)).  Here, the allegations demonstrate that LGH undertook its remediation efforts not to address physical damage to the property, but to prevent the spread of COVID-19 among people present in the hospital.

Although LGH argues that these cases represent examples where the property was unsafe as a result of its potential harm to

humans, even though it remained structurally sound, a close review shows why the SJC concluded these cases did not help the plaintiffs in Verveine and why they also do not help LGH. In Gregory Packaging, the local fire department instituted a mile-radius evacuation zone around the affected property and did not allow the insureds to reenter the building until it was satisfied that the remediation company reduced the ammonia gas to "a safe level for occupancy." 2014 WL 6675934 at *1, *2-4. Similarly, in Western Fire Insurance Co., the insureds evacuated at the behest of the local fire department, which determined that "the infiltration of gasoline in the soil under and around the building" rendered the building "uninhabitable" and use of the building "dangerous." 437 P.2d at 54. There are no similar facts alleged here.[3] Instead, many of LGH's covered properties remained open for some uses, a fact that, per the SJC, indicates "there were not physical effects on the property itself." Verveine, 184 N.E.3d at 1276. Additionally, these cases are characterized by the uninhabitability of the premises due to pollution or persistent

---

[3] LGH alleges that two of its medical facilities were closed by government order from early March 2020 until May 11, 2020, and August 18, 2020, respectively. These closures were not a result of SARS-CoV-2 rendering the buildings uninhabitable, however, but instead the result of Massachusetts' policy on elective procedures. See Verveine, 184 N.E.3d at 1276 ("COVID-19 orders standing alone cannot possibly constitute 'direct physical loss of or damage to' property.").

odor emanating from the building itself, including its walls and foundation, not due to an infectious disease carried by people within the building. Given that "[commercial insurance] policies insure property, not people," it is understandable that an "all risk" policy would cover pollution arising from the covered property itself, not the people within it. See Schleicher & Stebbins Hotels, LLC v. Starr Surplus Lines Ins. Co., 302 A.3d 67, 77 (N.H. 2023).

Third, as the SJC did at the time it decided Verveine, we consider the clear consensus of courts throughout the country, which cuts against LGH and demonstrates the flaws in its argument. See Or. Clinic, PC v. Fireman's Fund Ins. Co., 75 F.4th 1064, 1071 n.1 (9th Cir. 2023) (noting that "as of May 25, 2023, 819 suits raising similar claims . . . have been dismissed with prejudice by federal and state courts"). For example, the New Hampshire Supreme Court recently held that the dissipation of SARS-CoV-2 within a month is essential to the determination that it does not cause direct physical loss or damage. See Schleicher & Stebbins Hotels, 302 A.3d at 78. As the court aptly stated:

> Accepting for the purposes of this appeal that . . . the virus can linger on surfaces for as long as 28 days, the fact that the virus will eventually dissipate on its own is significant to the question of whether the property has been changed in a distinct and demonstrable way. Property that has been changed in a distinct and demonstrable way

- 21 -

will not be changed back simply by the passage
of time.

Id. Similarly, as the Nevada Supreme Court explained, "[p]resence of a physical virus on the property, even if it 'attaches to' the property, does not give rise to the necessary transformative element of something like 'fire, water, or smoke.' Otherwise, the alleged presence of a physical force would 'render[] every sneeze, cough, or even exhale' a qualifying harm." Starr Surplus Lines Ins. Co. v. Eighth Jud. Dist. Ct. in & for Cnty. of Clark, 535 P.3d 254, 264 (Nev. 2023) (citations omitted).

The logic in these opinions echoes the SJC's explanation in Verveine that "the question is not whether the virus is physical, but rather if it has direct physical effect on property that can be fairly characterized as 'loss or damage.'" 184 N.E.3d at 1275. And as multiple courts have found, such direct physical effect on property does not occur with SARS-CoV-2, where "the problem of COVID-19 and its associated health risks are entirely dependent on people being present at the property, rather than arising from any harm to or defect in the property itself." Eighth Jud. Dist. Ct., 535 P.3d at 266. Thus, we conclude that the SJC would find no coverage under the physical property damage provision here, despite the detailed allegations in LGH's amended complaint.

We address one final point on this issue. We disagree with LGH that ruling that a virus or disease cannot cause physical

- 22 -

loss or damage under the policy is irreconcilable with the policy's Disease Contamination Coverage provision. This provision states:

> If <u>as a result of</u> an evacuation or decontamination order at a **location** by the National Center [sic] for Disease Control, authorized public health official or governmental authority because of the discovery or suspicion of a communicable disease or the threat of the spread of a communicable disease, the Insurer will pay for: **(1)** direct physical loss of or damage to covered property . . . .

(First emphasis added.) The plain text of the policy clearly contemplates coverage for a direct physical loss of or damage to property "as a result of an evacuation or decontamination order," not from the communicable disease itself.

In sum, we conclude that the district court did not err in finding LGH failed to allege "direct physical loss of or damage to" its covered property. The allegations, taken as true, demonstrate only a risk to people from the virus, not tangible damage to LGH's physical property requiring remediation. Our conclusion here reflects not only our understanding of Massachusetts law, but also the clear consensus of courts across the country.

## C. Disease Contamination Coverage Provision

LGH next argues that the district court erred in dismissing its claim under the Disease Contamination Coverage provision. On this issue, we agree with LGH.

This provision covers losses or costs incurred when four criteria are met: (1) LGH is subject to "an evacuation or decontamination order"; (2) "at a [covered] location"; (3) issued "by the National Center [sic] for Disease Control, authorized public health official or governmental authority"; (4) "because of . . . the threat of the spread of a communicable disease." (Emphasis omitted.) LGH alleges that it was subject to several mandatory orders from the Massachusetts DPH and, by reference, the CDC, which are sufficient to trigger coverage under this provision.

Importantly, on appeal, Continental has not contested that LGH has met the last three criteria for coverage under this provision. Instead, Continental focuses on the first factor -- whether LGH was subject to a "decontamination order" -- and argues that it was not. In Continental's view, the DPH and CDC directives cited by LGH were not mandatory orders at all. Further, Continental contends the directives did not require "decontamination."

The terms "decontamination order," "decontamination," and "order" are not defined in the policy, and accordingly we construe their "fair meaning . . . as applied to the subject

matter." Gordon, 632 N.E.2d at 1189 (citation omitted). Under this framework, we reject both of Continental's arguments.[4]

### 1. The Directives Were Orders

The "fair meaning" of the term "order" is unambiguous, and as such we consider whether the directives identified by LGH are "orders" within that term's "usual and ordinary sense." Citation Ins. Co., 688 N.E.2d at 952-53 (citation omitted). As other courts interpreting this term have found, and we agree, an "order" must be compulsory. See Conn. Child.'s Med. Ctr. v. Cont'l Cas. Co., No. 22-322, 2023 WL 2961738, at *2 (2d Cir. Apr. 17, 2023) (discussing the lack of "orders that required Plaintiffs-Appellants to evacuate or decontaminate their properties" (emphasis added)); PS Bus. Mgmt., L.L.C. v. Fireman's Fund Ins. Co., No. 21-30723, 2022 WL 2462065, at *4 (5th Cir. July 6, 2022) (discussing whether "any public health order mandated that [Plaintiffs'] premises 'be evacuated, decontaminated, or disinfected'" (emphasis added)). The parties do not dispute this definition. Rather, they dispute whether the sanctions LGH would face for its noncompliance with the DPH and CDC directives are

---

[4] In a footnote in its brief, Continental also suggests that LGH's claims under the Disease Contamination Coverage provision would be foreclosed by several exclusions. We leave for the district court to decide any issues related to the alleged exclusions given that Continental did not include an argument on this defense in its briefing below or on appeal.

- 25 -

severe enough for those directives to be considered "orders."  We hold that they are.

LGH alleges that beginning on March 15, 2020, DPH directed all Massachusetts hospitals to "postpone or cancel any nonessential, elective invasive procedures," which were defined as "procedures that are scheduled in advance because the procedure does not involve a medical emergency."  It further alleges that beginning on May 18, 2020, it was subject to an updated memorandum requiring it to comply with specific public health and safety standards before the hospital was allowed to move forward with "elective procedures" such as "cancer screenings in high-risk groups," "prenatal care," "removal of breast malignanc[ies]," and "organ transplants."  The mandatory public health standards included "cleaning and disinfection of all common and procedural areas."  LGH claims an additional June 2020 memorandum required its "[o]ngoing compliance" with the prior "public health and safety guidelines," as well as with "CDC requirements and other public health guidance regarding environmental infection controls" before engaging in "non-essential elective invasive procedures and services."  As LGH points out, both the May and June 2020 directives required that it attest to its compliance with the stated conditions and informed LGH that noncompliance would result in "remedial action or suspension of [non-essential elective invasive] procedures and services."  According to Continental,

however, the directives were not orders because LGH could have "chosen" to remain open for only non-elective procedures or waited for DPH to change the requirements for hospitals to resume elective procedures.

We cannot square Continental's argument with our obligation to interpret the policy "in a reasonable and practical way, consistent with its language, background, and purpose." Gen. Hosp. Corp., 16 F.4th at 308 (citation omitted). LGH's compliance with the directives was not optional under any practical understanding of that term. Conducting the type of urgent elective procedures identified in the directives is important both to LGH's mission of providing necessary care to its community and to its bottom line and ability to operate. As LGH convincingly argues, the "choice" to comply with the stated conditions or forgo the ability to treat "the vast majority of its patients" for an indefinite period is no choice at all.

Further, Continental's interpretation would be inconsistent with the purpose of the policy: insurance coverage so that LGH could continue to provide medical care to patients. Following Continental's argument to its logical conclusion, no evacuation or decontamination directive would ever be mandatory, because a facility would always have the option of ceasing to provide all or a subset of medical services instead of complying.

The additional coverage LGH purchased with the Health Care Endorsement would therefore be illusory.

Finally, Continental cites two cases affirming district court rulings that government decontamination orders were insufficient to support coverage under similar insurance provisions interpreted under Connecticut and Louisiana law. See Conn. Child.'s Med. Ctr., 2023 WL 2961738, at *2 (applying Connecticut law and upholding the grant of a motion to dismiss where the plaintiff-hospital "failed to allege that any specific government order required them to evacuate or decontaminate their properties" (emphasis added)); PS Bus. Mgmt., L.L.C., 2022 WL 2462065, at *4 (applying Louisiana law and upholding the grant of a motion to dismiss where the plaintiff failed to allege "that any public health order mandated that their premises 'be evacuated, decontaminated, or disinfected'"). However, in each of these cases the plaintiffs failed to describe the specific evacuation or decontamination orders their property was subject to, instead referring generally to executive orders and public health guidance. See Complaint at ¶¶ 45-57, Conn. Child.'s Med. Ctr. v. Cont'l Cas. Co., 581 F. Supp. 3d 385 (D. Conn. 2022) (No. 3:21-cv-291) (failing to identify the specific orders requiring decontamination and alleging plaintiff was subject to social gathering restrictions, "directives and guidance" from the Connecticut Department of Public Health, and "guidance" from OSHA

and the CDC); Notice of Removal, Exhibit B at 3 ¶ 9, PS Bus. Mgmt. v. Fireman's Fund Ins. Co., 2021 WL 4989870 (E.D. La. Oct. 7, 2021) (No. 2:21-cv-1229) (alleging only that plaintiff was subject to "non-essential business[]" closures).  These examples are clearly distinguishable from the specific and detailed allegations in LGH's amended complaint.

## 2. The Orders Required Decontamination

The parties also dispute whether the DPH and CDC directives were "decontamination" orders.  Importantly, both LGH and Continental agree that decontamination involves "remov[ing]," "eliminat[ing]," or "rid[ding] [a property] of" contamination. But Continental argues that an insured can never remove, eliminate, or rid itself of COVID-19 "because it is repeatedly reintroduced by people."  Extending the logic of Continental's argument, the Disease Contamination Coverage would not apply to COVID-19 at all and could only be invoked when an insured's efforts lead to near-permanent decontamination.

At this motion to dismiss stage, viewing LGH's well-pled allegations in the light most favorable to it, we disagree with Continental.  We begin, of course, with "the actual language of the polic[y]." Brazas Sporting Arms, Inc., 220 F.3d at 4; see also Gen. Hosp. Corp., 16 F.4th at 308.  The Disease Contamination Coverage provision specifically applies to public health orders issued "because of the discovery or suspicion of a communicable

- 29 -

disease or the threat of the spread of a communicable disease." There is no dispute that COVID-19 is a communicable disease. Further, Continental has not pointed us to any language in the policy suggesting that decontamination needs to be near-permanent to qualify for coverage. Continental's own example of decontamination, the removal of bacteria that causes Legionnaires' disease from ventilation equipment, does not on its face foreclose the possibility that the bacteria could be reintroduced to the newly cleaned equipment.

Additionally, Continental's argument that the term "decontamination" means near-permanent decontamination appears at odds with the purpose of the policy. By Continental's reasoning, a hospital that could become re-contaminated within the policy period with a particular bacteria or virus would never be able to claim coverage under the Disease Contamination Coverage provision. Yet the very nature of a "communicable disease" implies the possibility of re-contamination. Thus, the risk that a hospital's premises could be contaminated multiple times with a particular bacteria or virus during the outbreak of a communicable disease appears to be the type of healthcare-specific risk that the policy was designed to cover. See Brazas Sporting Arms, Inc., 220 F.3d at 4 (requiring, under Massachusetts law, that we "consider 'what an objectively reasonable insured, reading the relevant policy language, would expect to be covered.'" (citation omitted)).

Finally, we disagree with Continental's argument that the limited use of the term "decontamination" in the DPH or CDC directives "proves that decontamination was not the objective" of those directives. Continental quotes from a section of the CDC directive that uses the word "decontamination" in suggesting that extremely elevated temperatures (above 158 degrees Fahrenheit) may be an effective form of eliminating COVID-19 contamination but noting such a strategy "is not generally recommended and is not realistic for occupied spaces." Continental argues that this discussion indicates the CDC believed COVID-19 decontamination to be unattainable. This is an overreading of the CDC document. Over ten pages, the CDC articulates a range of strategies to reduce the risk of contracting COVID-19 in indoor spaces, including improvements to ventilation systems and the use of ultraviolet germicidal irradiation lights. That the CDC counseled against one decontamination method is not an indication that it believed decontamination by any method to be impossible.

## III. CONCLUSION

For all these reasons, we **AFFIRM IN PART**, **REVERSE IN PART**, and **REMAND** for further proceedings. The parties shall bear their own costs.