# United States Court of Appeals
## For the First Circuit

No. 03-2357

JOHN COYNE,

Plaintiff, Appellee,

v.

MARGARET CRONIN,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nancy Gertner, U.S. District Judge]

Before

Boudin, Chief Judge,

Selya, and Howard, Circuit Judges.

Jeremy M. Sternberg, Assistant United States Attorney with whom Michael J. Sullivan, United States Attorney, was on brief, for appellant.

Harry L. Miles with whom Green, Miles, Lipton & Fitz-Gibbon, was on brief, for appellee.

October 12, 2004

**HOWARD**, **Circuit Judge**. Defendant Margaret Cronin, an FBI agent, brings this interlocutory appeal to challenge the district court's denial of her motion to dismiss a federal constitutional claim asserted against her by plaintiff John Coyne under the Bivens doctrine. See Bivens v. Six Unknown Named Agents, 403 U.S. 388, 397 (1971). We have jurisdiction because Cronin's motion was based on her claim of qualified immunity and because her challenge to its denial involves only abstract legal questions. See, e.g., Limone v. Condon, 372 F.3d 39, 43 (1st Cir. 2004). Disposition of this appeal requires us to decide, first, whether assertions made in an affidavit Coyne submitted to the government in connection with administrative proceedings on a related claim should be considered part of the relevant corpus of facts, and second, whether the relevant corpus of facts gives rise to a viable claim that Cronin violated a "clearly established" constitutional right. See, e.g., Santana v. Calderon, 342 F.3d 18, 23 (1st Cir. 2003).

The operative complaint in this troubling case alleges that, in April 1999, Coyne began sending letters to the security team at the Concord State Prison in Concord, Massachusetts, where he was incarcerated. The letters contained information about corruption in the prison and illegal activities committed or planned by other inmates. In September 1999, Coyne was transported to the United States Courthouse in Boston, where he met with Cronin, another unnamed FBI agent, an unnamed assistant United

-2-

States Attorney, and a police officer from the city of Cambridge. The meeting was held in response to the letters Coyne had been sending to the prison's security team.

During the meeting, Coyne told Cronin that he had additional information, but that he feared for his safety if he passed it along. Cronin thanked Coyne for his prior disclosures and assured him that she would take the precautions necessary to keep him safe. Relying on this representation, Coyne shared the information with Cronin, who thereafter persuaded Coyne to feign an interest in participating in a still-developing plot by inmates to rob an armored car after their release from prison. Cronin told Coyne to send a letter to one of the individuals planning the robbery -- an inmate at the Norfolk State Prison -- stating that he (Coyne) would participate in the scheme if the others could wait until after his release. Knowing that mail cannot be sent between inmates at different penal institutions, Cronin instructed Coyne to send this "dummy letter," along with a second letter containing more detailed information for the FBI, to a phony company address in Boston that served as an FBI mail drop. Cronin told Coyne that the letter to the inmate would be forwarded to the inmate's girlfriend, who presumably would pass it along to the inmate, while she (Cronin) would keep the letter to the FBI. At some point during the next month, Coyne sent the requested letters to the mail drop.

On or about October 5, 1999, Coyne was brought to a conference room at the prison where he was met by Cronin. Cronin told Coyne that the FBI had made a "terrible mistake" and had forwarded Coyne's entire parcel -- including his letter to the FBI (which was sure to alert any reader that Coyne was an FBI informant) -- to the girlfriend of the inmate in the Norfolk State Prison. Cronin expressed concern for the safety of Coyne and his family and promised to do everything necessary to protect them. After the meeting, Cronin called Coyne's ex-wife and told her what had happened. She also called the local police in Coyne's ex-wife's town to warn them of the danger. Thereafter, word of Coyne's actions spread through the prison system and, at some point, Coyne had his teeth broken by a fellow inmate who accused him of "ratting" on others. Eventually, Coyne was transferred to the Hampshire House of Correction. Because of this transfer, Coyne lost an opportunity to participate in a halfway house program. He has since been released from prison. Coyne lives in fear for his safety and has received numerous threats since his term of imprisonment expired.

On July 23, 2001, Coyne brought the present lawsuit against the United States, Cronin and other unknown FBI agents, and the unknown assistant United States Attorney. The operative complaint charged the individual defendants with breach of contract and all defendants with negligence (the claim against the United

States lying under the Federal Tort Claims Act, 28 U.S.C. §§ 2671-2680) and a federal constitutional violation. The United States and Cronin moved to dismiss the complaint. Coyne filed an opposition to these motions, to which the United States and Cronin jointly replied. In the text of their reply memorandum, the United States and Cronin first alerted the district court to an affidavit Coyne had filed with the FBI in connection with the administrative claim he was obliged to file prior to filing his FTCA claim against the United States. See, e.g., Cascone v. United States, 370 F.3d 95, 103 (1st Cir. 2004) (prior filing of an administration claim is a jurisdictional prerequisite to a claim under the FTCA). The United States and Cronin took the position that the court could regard the affidavit as merged into the complaint, and therefore properly to be considered by it, despite the fact that their motions invoked Fed. R. Civ. P. 12. See Beddall v. State Street Bank & Trust Co., 137 F.3d 12, 17 (1st Cir. 1998) ("When . . . a complaint's factual allegations are expressly linked to -- and admittedly dependent upon -- a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under Rule 12(b)(6)."). They argued that, because the narrative in the affidavit was pertinent to whether Cronin had been acting within the scope of her employment (and thus pertinent to whether there was subject matter jurisdiction over the negligence

claims against Cronin and the United States, see Cascone, 370 F.3d at 103; Aversa v. United States, 99 F.3d 1200, 1209 (1st Cir. 1996) (court lacks subject matter jurisdiction to entertain tort claim against federal employee who committed the tort while acting within the scope of federal employment); see also 28 U.S.C. §§ 2679(b)(1), (d)(1)), the affidavit was so merged, see Dynamic Image Technologies, Inc. v. United States, 221 F.3d 34, 37-38 (1st Cir. 2000) (extrinsic materials bearing on a court's subject matter jurisdiction may be considered in connection with a Rule 12 motion to dismiss without conversion of motion into one for summary judgment); Aversa, 99 F.3d at 1210 (similar).

Coyne's affidavit contained additional details about Cronin's actions after she learned of the mistaken mailing. But rather than attaching the affidavit to their reply memorandum, the United States and Cronin quoted from it, explaining that it contained sensitive information concerning third parties and asserting that its authenticity was undisputed. (Defendants also offered to make the affidavit available to the court upon request.) The quotations read as follows: (1) "Agent Margaret Cronin . . . called a member of the Inner Perimeter Security Team at Concord to request that [Coyne] be placed in 'the hole,'" and (2) "[Coyne met] with Special Agent Margaret Cronin of the FBI, and Lieutenant Branco of the Inner Perimeter Security Team (IPS), from Concord Prison [and at that meeting] Agent Cronin . . . explained that

[Coyne] was to be transferred out of Concord the next day to the Hampshire House of Correction in Northampton."

In a published opinion, the district court granted in part and denied in part defendants' motions. After explaining a prior oral ruling denying Coyne's motion to vacate the government's certification that Cronin had been acting within the scope of her employment, the court permitted Coyne's FTCA claim against the government to proceed but granted Cronin's motion to dismiss the negligence claim against her. See Coyne v. United States, 270 F. Supp.2d 104, 108-18 (D. Mass. 2003). The court also dismissed Coyne's breach of contract claims against the individual defendants. See id. at 118-19. Finally, the court denied the individual defendants' motions to dismiss the constitutional claim both on the merits and on the basis of the qualified immunity doctrine. See id. at 119-20.

With respect to the constitutional claims, the district court trained its focus exclusively on Cronin. The court stated that, while Coyne's constitutional claim against Cronin was "not well-developed," it "essentially amount[ed] to a generalized assertion that [Cronin's] actions violated a generic right to safety that is protected by the Fifth and Eighth Amendments." Id. at 119. Concluding that Coyne could demonstrate a violation of this right if he could show that Cronin had exhibited a "deliberate indifference" to his safety, id. at 119-20 (discussing cases

-7-

involving violence against inmates and a government informant), the court determined that the allegations in Coyne's complaint were sufficient to state such a claim:

> It can be fairly inferred from the allegations in the complaint that . . . Cronin, knowing that Coyne was in danger, failed to take steps to inform prison officials of the risk or otherwise make provision for his safety. In other words, she was deliberately indifferent to the danger he faced. The constitutional dimension of deliberate indifference to Coyne's plight is compounded because he was both a prisoner and was in danger by virtue of his cooperation with the government. Of course, proving this claim will require a showing that the defendant had actual, subjective knowledge of the risk to Coyne and did nothing to protect him -- more than mere negligence. But Coyne's allegations surely are adequate to survive a motion to dismiss.

Id. at 120.[1] The court then rejected Cronin's claimed entitlement to qualified immunity because the defense applies to conduct that does not violate "clearly established" rights of which a reasonable person would have known, id. at 120 (citing Hope v. Pelzer, 536 U.S. 730, 739 (2002)), and because "the law was clearly established at the time of the events in the case that government agents may not be deliberately indifferent to prisoner safety or government-

---

[1]The court also stated: "If, for example, . . . Cronin informed prison officials of the danger to Coyne and they then failed to protect him, she might arguably have fulfilled her constitutional obligations. Coyne then might still have potential claims against prison officials, but he has not named them as defendants in this case." 270 F. Supp. 2d at 120 n.8.

-8-

created dangers that cooperating citizens face; they have a duty to protect in such circumstances," id.

Cronin moved for reconsideration of this ruling, arguing that the inference that the district court drew -- that Cronin had "failed to take steps to inform prison officials of the risk or otherwise make provision for [Coyne's] safety" -- was contradicted by Coyne's affidavit. This time, Cronin attached a copy of the affidavit (with portions redacted) to her submission. But the court denied the motion in an unpublished order, holding that the affidavit was not properly before it on a Rule 12 motion. The court explained that, in its view, consideration of the affidavit would require conversion of Coyne's motion to dismiss into one for summary judgment. The court did not believe that such a conversion was warranted because "[t]he record is simply not sufficiently developed at this time to permit full and fair adjudication of this issue in a summary judgment posture." The court also emphasized that, even if it were to consider the affidavit, Coyne had only averred therein that it was his "understanding" that Cronin "had called a member of the Inner Perimeter Security Team at Concord to request that [Coyne] be place[d] in 'the hole' for [his] protection." In the court's view, Coyne's "understanding" did not permit it to "make a solid assessment of the extent and sufficiency of actions [Cronin] may have taken to protect [Coyne]." Finally, the court rejected Cronin's argument that the affidavit was

effectively merged into the complaint because, "unlike asserted exceptions to the Federal Tort Claims Act, the qualified immunity defense against the plaintiff's Bivens claim does not implicate the Court's jurisdiction."

Cronin challenges the district court's decision not to consider Coyne's affidavit. Cronin renews her argument that the affidavit was merged into the complaint under Beddall and similar cases. Alternatively, Cronin contends that the court erred in failing to consider the affidavit because the merits of an asserted entitlement to qualified immunity is to be determined "at the earliest possible state of litigation." Hunter v. Bryant, 502 U.S. 224, 227 (1991). Coyne does not argue that the court was entitled to disregard the affidavit. He contends that the court did consider it, but concluded that the document failed to undermine the inferences the court had drawn: that Cronin did nothing to alert prison officials or protect him after learning of the FBI's error. In pressing this argument, Coyne picks up on the court's statement that the affidavit only set forth his "understanding" that Cronin had contacted a member of the prison's Inner Perimeter Security Team and asked that Coyne be transferred to more secure environs.

The inference upon which the district court premised its denial of Cronin's motion to dismiss on qualified immunity grounds -- that Cronin "failed to take steps to inform prison officials of

-10-

the risk or otherwise make provision for his safety," 270 F. Supp. 2d at 120 -- is unsustainable if the allegations in Coyne's affidavit are to be credited. Even if we leave aside the allegations based on Coyne's mere "understanding" about the nature of Cronin's call to prison staff, the balance of the affidavit unambiguously places a state prison security official at a meeting within the prison during which Cronin told Coyne about the FBI's mistake and the plan to place him in more secure detention pending his transfer to the Hampshire House of Correction "the next day." If the details of this meeting are to be considered, one simply cannot infer reasonably that Cronin failed to communicate with prison officials or to make at least some provisions for Coyne's safety. For this reason, as set forth in our introductory paragraph, the outcome determinative questions in this appeal are whether the court erred in declining to consider the affidavit and, if so, whether Cronin is entitled to qualified immunity in light of the affidavit. We think that each question must be answered in the affirmative.

As we already have indicated, there are times when a court should take into account documents beyond the complaint in evaluating whether a Fed. R. Civ. P. 12 motion should be granted. See, e.g., Beddall, 137 F.3d at 17; Watterson v. Page, 987 F.2d 1, 3-4 (1st Cir. 1993); Romani v. Shearson Lehman Hutton, 929 F.2d 875, 879 n.3 (1st Cir. 1991). One such situation occurs when there

-11-

is some doubt about a court's subject matter jurisdiction. See Dynamic Image Technologies, 221 F.3d at 37-38; Aversa, 99 F.3d at 1209-10. Coyne's sworn admissions that Cronin informed prison officials of the FBI's error and took affirmative measures to keep him safe were pertinent to the jurisdictional inquiries that the district court was obliged to conduct in connection with Coyne's motion to vacate the government's scope-of-employment certification and, by extension, the United States' and Cronin's motions to dismiss the negligence claims. We therefore think that the admissions, and the affidavit which contained them, were properly before the court.

We recognize that the admissions were not brought to the district court's attention until the United States and Cronin replied to Coyne's opposition to their motions to dismiss, and that the affidavit was not itself submitted until Cronin filed her motion for reconsideration. We also recognize that the admissions were not introduced in connection with the motions raising questions about the court's jurisdiction. But to hold that the affidavit must be disregarded on either of these bases would waste time and resources without reason. Coyne does not oppose consideration of the affidavit and he gives no reason for allowing himself to back away from it. Cf. Coluatuoni v. Alfred Calcagni & Sons, Inc. 44 F.3d 1, 5 (1st Cir. 1994) (affidavit of interested witness that contradicts same witness's earlier deposition does not

-12-

create a factual conflict unless change in testimony is satisfactorily explained); Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 806-07 (1999) (listing without endorsing cases similar to Coluantuoni across the circuits and holding that a "similar insistence upon explanation is warranted . . . where the conflict involves a legal conclusion"). Moreover, as we shall explain momentarily, the admissions are highly relevant to Cronin's entitlement to qualified immunity -- an issue the court was obligated to resolve as early as possible. See Hunter, 502 U.S. at 227. Under the circumstances, we think that the admissions in the affidavit should have been taken into account.

This takes us to the nub of the qualified immunity inquiry: whether the operative set of allegations might ground a plausible finding that Cronin violated Coyne's clearly established constitutional rights. See, e.g., Santana, 342 F.3d at 23. The threshold question in conducting this inquiry is whether the allegations, taken in the light most favorable to Coyne, could support a conclusion that Cronin abridged any such right. See id. Coyne's documentary submissions are unclear about the theories he is advancing and the conduct that Coyne believes to have exceeded constitutional limits. At oral argument, however, Coyne clarified that he is claiming under the Fifth Amendment's due process guarantee and the Eighth Amendment's proscription against cruel and unusual punishments for Cronin's lapses during two distinct time

periods: the period prior to the point at which Cronin learned that Coyne's letter to the FBI had been forwarded, and the period after she learned of the mistaken mailing. As to the first of these periods, Coyne identifies as unconstitutional Cronin's alleged failure to oversee with care the letter-writing ruse in which she asked him to participate; as to the second, Coyne cites Cronin's alleged abandonment of him in the dangerous prison environment.

Because Cronin is a federal agent and does not work for Coyne's jailer (the Commonwealth of Massachusetts), we have difficulty seeing how her acts and omissions could constitute "punishment" within the sweep of the Eighth Amendment's Cruel and Unusual Punishments Clause. Cf. Ingraham v. Wright, 430 U.S. 651, 671-72 n.40 (1977) (observing that the punishment with which the Eighth Amendment is concerned is that imposed by a sovereign after it has secured a formal adjudication of guilt in accordance with due process of law). But to say that Coyne has no viable Eighth Amendment claim against Cronin because she is not an agent of the sovereign that incarcerated him is not to say, ipso facto, that Cronin has no constitutional claim against Cronin. The Fifth Amendment's due process guarantee is in part substantive and, in a narrow set of circumstances, may itself be invoked to challenge executive conduct where no other constitutional provision more directly applies. See County of Sacramento v. Lewis, 523 U.S. 833, 842-45 (1998). And although the government's failure to protect an

-14-

individual from third-party private violence (even in the face of a known danger) ordinarily does not constitute a due process violation, see DeShaney v. Winnebago County Dep't of Soc. Servs., 489 U.S. 189, 197 (1989), we have recognized that the Due Process Clause may be implicated where the government affirmatively acts to increase the threat to an individual of third-party private harm or prevents that individual from receiving assistance, see Frances-Colon v. Ramirez, 107 F.3d 62, 64 (1st Cir. 1997); see also Butera v. District of Columbia, 235 F.3d 637, 648-51 & n.10 (D.C. Cir. 2001) (noting that the federal circuit courts are unanimous in excepting cases of this sort from application of the DeShaney principle). Thus, while Cronin cannot be liable to Coyne under the Eighth Amendment for breaching constitutional obligations running from jailers to prisoners, he might at least theoretically premise a due process claim against Cronin on the facts that he (Coyne) was someone else's prisoner and therefore especially vulnerable, that Cronin (a federal agent) promised him protection, and that Cronin's actions -- in permitting the letter to the FBI to be forwarded and in failing to protect him afterwards -- were the source of an increased danger that ultimately caused him harm. Cf. Butera, 235 F.3d at 652 (recognizing that a viable due process claim might arise from a failure to protect a government informant participating in a sting operation from third-party private harm).

-15-

Coyne's problem is that, in order to prevail on any such theory (assuming _arguendo_ its viability), he would have to show that Cronin's conduct was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." _Lewis_, 523 U.S. at 847 n.8. The hurdle is high because "[o]ur Constitution deals with the large concerns of the governors and the governed, but it does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society." _Id._ at 848 (quoting _Daniels_ v. _Williams_, 474 U.S. 327, 332 (1986)) (internal quotation marks omitted); _see also_ _Paul_ v. _Davis_, 424 U.S. 693, 701 (1976) (explaining that the Fourteenth Amendment's Due Process Clause is not "a font of tort law to be superimposed upon whatever systems may already be administered by the States").

The conscience-shocking standard is not a monolith; its rigorousness varies from context to context. _See_ _Lewis_, 523 U.S. at 850. In situations where a substantive due process claim might lie but where government officials must act in haste, under pressure, and without an opportunity for reflection, even applications of deadly force by those officials cannot be conscience-shocking unless undertaken maliciously and sadistically for the very purpose of causing harm. _Id._ at 852-54 (applying to a substantive due process claim arising from a high speed police chase the "actual malice" liability standard, derived from the

-16-

Eighth Amendment, applicable to prisoner claims arising from a prison riot).  By contrast, in situations where a substantive due process claim might lie and where actual deliberation on the part of a governmental defendant is practical, the defendant may be held to have engaged in conscience-shocking activity even without actual malice (to take one familiar example, if a government official assumes custody of a person and then displays deliberate indifference to his ward's basic human needs).  See id. at 849-50 & n.10.  The spectrum is wide because substantive due process violations tend to come in various shapes and sizes and in a multitude of configurations.  We need not probe too deeply where along this spectrum of levels of fault Coyne's claim against Cronin may lie because the complaint does not fairly allege deliberate indifference, let alone any more serious level of scienter.[2]

To make such a showing, Coyne must, at a bare minimum, demonstrate that Cronin actually knew of a substantial risk of serious harm to him and disregarded that risk.  See Farmer v. Brennan, 511 U.S. 825, 837 (1994); Calderón-Ortiz v. Laboy-Alvarado, 300 F.3d 60, 64 (1st Cir. 2002).  Coyne's complaint does not satisfy this standard.  It fails to state a viable

---

[2]In explaining this conclusion, we should make clear that we are not in any way holding that Cronin's conduct in the present context would necessarily be governed by a deliberate indifference standard.  We would have to address that issue only if the complaint properly asserted deliberate indifference.  Here, it does not.

constitutional claim because it fails to make such allegations directly, or in substance, or even by fair implication. <u>See</u> <u>Educadores Puertorriqueños en Acción</u> v. <u>Hernández</u>, 367 F.3d 61, 68 (1st Cir. 2004) (the notice pleading requirements of Fed. R. Civ. P. 8(a)(2) are minimal but they must be observed); <u>see</u> <u>also</u> <u>Torres-Viera</u> v. <u>Laboy-Alvarado</u>, 311 F.3d 105, 108 (1st Cir. 2002) (dismissing complaint of inmate injured by a tear gas cannister fired in a prison riot for failing either to allege or to plead facts "which permit[] a reasonable inference to be drawn that the tear gas cannister was fired maliciously or sadistically for the very purpose of doing harm").

Although the complaint alleges plenty of facts, it does not even hint at a suggestion that Cronin acted with deliberate indifference towards Coyne's well being. Insofar as Coyne's due process claim is based on his first case theory -- that Cronin violated his rights prior to learning that his letter to the FBI had been forwarded -- Coyne has not alleged facts from which one might infer either that (1) Cronin deliberately caused Coyne's role as a government informant to be revealed to the prison community (e.g., by intentionally forwarding the letter), or (2) Cronin knew that there was a substantial risk that Coyne would be so exposed as a result of the ruse and disregarded that risk (e.g., by telling Coyne to mail his letter to an assistant with a known track record of botching confidential communications and then by failing to

-18-

supervise that assistant).[3] And insofar as Coyne's claim is based on his second case theory -- that Cronin abandoned him after learning of the mistaken mailing -- the complaint's factual allegations (as supplemented by his affidavit) directly contradict the theory's premise by admitting that a prison security official was present when Cronin notified Coyne of the mistaken mailing and that Cronin had made arrangements for Coyne's transfer to a different prison.

If matters were at all different or there were any concrete suggestion as to what might plausibly be developed against Cronin that would suggest conscience-shocking behavior, we would be sympathetic to discovery. But everything we know from the complaint and Coyne's own allegations show that this is basically a negligence case to which the government must respond but for which Cronin may not be sued under the Due Process Clause. See Lewis, 523 U.S. at 849 ("liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process").

The district court's judgment denying Cronin's motion to dismiss Coyne's constitutional claims against her is **reversed** and the matter is **remanded** for further proceedings consistent with this opinion.

---

[3]In any event, such allegations would be highly implausible since Cronin was relying upon Coyne to make her case.