# United States Court of Appeals
## For the First Circuit

No. 23-1388

CARMEN MALDONADO-GONZÁLEZ; MUNICIPALITY OF MOROVIS; GENOVEVA
LÓPEZ; JUSTINIANO CALDERÓN; SHIRLEY SOTO; AUREA CASTELLANO;
SONIA OTERO; PABLO RIVERA-BURGOS; and MIGUEL A. SEPÚLVEDA,

Plaintiffs, Appellants,

v.

PUERTO RICO AQUEDUCT & SEWER AUTHORITY; DORIEL I. PAGÁN-CRESPO,
in her personal capacity and official capacity as Executive
Director; and JOSÉ A. RIVERA ORTIZ, in his official capacity as
Regional Executive Director,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Bruce J. McGiverin, U.S. Magistrate Judge]

Before

Barron, Chief Judge,
Thompson and Rikelman, Circuit Judges.

Andrés C. Gorbea-Del Valle for appellants.

Omar Andino-Figueroa, Deputy Solicitor General of Puerto
Rico, with whom Mariola Abreu-Acevedo, Assistant Solicitor
General, and Fernando Figueroa-Santiago, Solicitor General of
Puerto Rico, were on brief, for appellee Pagán-Crespo.

Germán A. Rieckehoff, with whom Arlyn González-Díaz and
Cancio, Nadal & Rivera, L.L.C. were on brief, for appellee Puerto
Rico Aqueduct & Sewer Authority.

October 24, 2025

**RIKELMAN, Circuit Judge.** For many years, there has been a water crisis in the Municipality of Morovis in Puerto Rico: on most days, there is no water service. The plaintiffs, who are residents of Morovis and subscribers of the Puerto Rico Aqueduct and Sewer Authority (PRASA), sued PRASA and its officials for conduct that they claim perpetuated the water service crisis. The district court dismissed their case in full, before any discovery.

The plaintiffs appealed, and we agree that the district court erred in dismissing their substantive due process claim on the ground that they failed to allege government conduct that shocks the conscience. Thus, we vacate the district court's order and remand for further proceedings.

## I. BACKGROUND

### A. Relevant Facts

In reviewing the district court's grant of the defendants' motions to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), we draw the facts from the complaint, "taking the well-pleaded facts as true and construing all reasonable inferences in [the plaintiffs'] favor." Doe v. City of Boston, 145 F.4th 142, 146 (1st Cir. 2025) (quoting Lawrence Gen. Hosp. v. Cont'l Cas. Co., 90 F.4th 593, 595 (1st Cir. 2024)).

This case concerns the provision of water service in Morovis, a municipality in central Puerto Rico that is home to

just under 30,000 residents. The primary drinking water supply source for Morovis is the Rio Grande de Manatí ("the river"). Water is pumped from PRASA's intake facility, located on the river, to its treatment plant in Morovis, where the raw water is treated before distribution to PRASA subscribers. According to the plaintiffs, however, there are serious infrastructure issues with PRASA's Morovis facilities.

PRASA is an instrumentality of the Puerto Rico government and the sole provider of water service in Puerto Rico. For several years, PRASA has not provided Morovis with adequate water service. The lack of water has been particularly acute since 2017: early that year, Carmen Maldonado González began her term as mayor and later that year, Hurricane María struck Puerto Rico. Each day, on average, at least three of the fourteen wards in Morovis have no water service.

Between 2017 and the filing of this lawsuit, Morovis spent more than one million dollars addressing the water service crisis. For example, it bought water tanks for residents, purchased and distributed water, and hired experts to advise on potential solutions to the crisis. In 2018, the municipality entered into an agreement with the United States Army Corps of Engineers to "plan the necessary actions to improve the performance and capacity" of PRASA's facilities in Morovis. The Army Corps then issued a report with recommendations, which was submitted to

PRASA in December 2019. As of the date of the plaintiffs' complaint,[1] PRASA had taken no action on the report.

During this time, Mayor Maldonado[2] and her staff regularly contacted and met with PRASA officers, including defendants Doriel Pagán Crespo, PRASA's Executive Director, and José A. Rivera Ortiz, PRASA's Regional Executive Director for Morovis. During their interactions, Mayor Maldonado repeatedly asked Pagán to connect the water infrastructure in Morovis to PRASA's "superaqueduct," a pipeline with a production capacity of approximately 100 million gallons of water per day. But Pagán insisted that PRASA must exhaust all other alternatives before it would consider connecting the Morovis water system to the superaqueduct. Mayor Maldonado's team also asked Rivera why a 200,000-gallon water tank located in Morovis was not being used. In response, Rivera claimed to be unaware that the tank existed.

Despite frequent -- sometimes daily -- communication with Mayor Maldonado and her team about the water crisis, PRASA has done little to address the lack of water in Morovis. During most water outages, PRASA has not provided an alternative source

---

[1] For simplicity's sake, we will refer to the July 2022 amended complaint as "the complaint."

[2] We follow the parties' lead and Spanish naming conventions and refer to the appellant as "Maldonado." See United States v. Rosa-Borges, 101 F.4th 66, 68 n.1 (1st Cir. 2024). We follow the same convention for other parties in this case.

- 5 -

of water to the plaintiffs, although occasionally PRASA has sent water trucks to Morovis. And, PRASA has not adjusted water service invoices for its Morovis subscribers despite the water service problems.

Although there are infrastructure issues with PRASA's intake facility and treatment plant in Morovis, sometimes fixing the water outage is as simple as flipping a switch: turning on the pumps and/or power generators located in those facilities. For example, after Morovis hired former PRASA employee Tony La Luz to help it understand its ongoing water service problems, La Luz visited the Morovis water treatment plant on February 5, 2022, to find out why there was no water service that day. PRASA employees told La Luz that the treatment plant was out of service because there was no electricity and the power generator at the Morovis intake facility was not working. La Luz then proceeded to the intake facility to verify the problem with the power generator. At the intake facility, a PRASA employee solved the problem within five minutes by turning on the generator. Still, the pumps at the intake facility did not turn on, even though they should have done so automatically when power returned. The PRASA employee who was present contacted a supervisor who dispatched another employee to the site to turn on the pumps. That employee eventually arrived and told La Luz that the pumps had been turned off. The employee then simply turned them back on. When the PRASA employee and La

Luz then inspected the Morovis intermediate tank at the treatment facility, they discovered that the pumps were also turned off there, even though they too should have turned on automatically with power. Again, the PRASA employee easily turned on the pumps.

After La Luz reported the troubling incident with the pumps to Mayor Maldonado, she called Rivera to relay what she had learned. Although Rivera was incredulous, a PRASA supervisor confirmed that the information was correct. Mayor Maldonado then requested that Rivera check surveillance video from the facilities to uncover who had turned off the power generator and pumps. As of the filing of the complaint in this case in July 2022, Rivera had not responded to this request.

Mayor Maldonado and her staff have also received "tipoffs" that PRASA's management instructed employees to close the water passage keys that supply water to Morovis and to turn off pumps and power generators at the Morovis facilities in order to damage Maldonado's image as Mayor. Although Mayor Maldonado requested that PRASA investigate these allegations, PRASA has not done so.

### B. Procedural History

Mayor Maldonado, the Municipality of Morovis, and several residents who are subscribers of PRASA sued PRASA, Pagán, and Rivera in federal court seeking damages under 42 U.S.C. § 1983, as well as equitable and declaratory relief. Each plaintiff has

a valid registered account with PRASA and has paid the required bond for their account as well as their monthly water service invoices. The plaintiffs seek to represent a class of up to 28,000 similarly situated subscribers in Morovis. Their purported class includes "people of old age," people "with diseases," and people with children. According to the plaintiffs, the defendants have violated their substantive due process rights under the Fourteenth Amendment by depriving them of their protected property interest in water service.

PRASA and Pagán, in her personal capacity, each moved to dismiss the complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).[3] The district court granted both motions and dismissed the complaint as to all defendants and all forms of relief.

The plaintiffs timely appealed.

## II. STANDARD OF REVIEW

"We review de novo a district court's decision to grant a motion to dismiss under Rule 12(b)(6), reversing the dismissal only if the combined allegations, taken as true . . . state a plausible, not a merely conceivable, case for relief." Doe, 145

---

[3] The plaintiffs originally sued Rivera in both his official capacity and his personal capacity but later agreed to voluntarily dismiss their personal-capacity claims against him. Because only the official-capacity claims against him remained, Rivera did not file his own motion to dismiss before the district court, separate from PRASA's motion.

F.4th at 149 (internal quotation marks omitted) (quoting Lawrence Gen. Hosp., 90 F.4th at 598). "To determine whether the plaintiff[s'] allegations are plausible, we 'separate factual allegations from conclusory ones.'" Id. (quoting Lawrence Gen. Hosp., 90 F.4th at 598). And, as we previewed above, we "accept as true all well-pleaded facts alleged in the . . . complaint and draw all reasonable inferences therefrom in [the plaintiffs'] favor." Id. (quoting Lawrence Gen. Hosp., 90 F.4th at 598).

Although the plaintiffs included a number of claims in their complaint, on appeal, they pursue only their substantive due process claim.

### III. DISCUSSION

The plaintiffs allege that the defendants deprived them of their property interest in water service, a property interest that they contend exists under both Puerto Rico law and their contracts with PRASA, and thereby violated their substantive due process rights under the Fourteenth Amendment. The Fourteenth Amendment prohibits the government from depriving any person of "life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Due process has both procedural and substantive components. The right to procedural due process "guarantee[s] . . . that, before a significant deprivation of liberty or property takes place at the state's hands, the affected individual must be forewarned and afforded an opportunity to be

- 9 -

heard at a meaningful time and in a meaningful manner." González-Droz v. González-Colón, 660 F.3d 1, 13 (1st Cir. 2011) (internal quotation marks omitted) (quoting Amsden v. Moran, 904 F.2d 748, 753 (1st Cir. 1990)). The right to substantive due process "safeguards individuals against certain offensive government actions, notwithstanding that facially fair procedures are used to implement them." DePoutot v. Raffaelly, 424 F.3d 112, 118 (1st Cir. 2005) (citing Daniels v. Williams, 474 U.S. 327, 331 (1986)).

To analyze the plaintiffs' substantive due process claim, we begin by asking "whether the challenged government conduct 'is legislative or executive in nature'" because "[c]hallenges to executive versus legislative conduct garner different judicial examinations." Foote v. Ludlow Sch. Comm., 128 F.4th 336, 345-46 (1st Cir. 2025) (quoting DePoutot, 424 F.3d at 118). The line between executive and legislative conduct "is not always well-defined" and "some government conduct can even straddle the line." Id. at 345. Ordinarily, however, statutes and generally applicable governmental policies, even when those policies are made by executive agencies, qualify as legislative conduct. See id. Executive conduct, by contrast, typically involves "individual acts of government officials . . . untethered from any policy." Id.

Just like the district court, we understand the challenged conduct here to be executive action, and the parties do not argue otherwise. Although the plaintiffs allege that "PRASA has a pattern, custom, policy[,] or practice of leaving its [Morovis] subscribers . . . without water," they primarily attribute the water crisis to the conduct of individual PRASA officers who are aware of the crisis yet, repeatedly, have failed to take steps within their power to "fix the problem."[4] Because the plaintiffs challenge executive action, they must establish that "they suffered the deprivation of an established life, liberty, or property interest, and that such deprivation occurred through governmental action that shocks the conscience." Clark v. Boscher, 514 F.3d 107, 112 (1st Cir. 2008).

The district court held that the plaintiffs' substantive due process claim failed because, it concluded, the plaintiffs did not plausibly allege conduct that shocks the conscience. See Maldonado-Gonzalez v. P.R. Aqueduct & Sewer Auth., No. 22-cv-1250, 2023 WL 2601940, at *6 (D.P.R. Mar. 22, 2023). It then also held that the plaintiffs' contracts with PRASA could not be the basis of their substantive due process claim. See id. at *10.[5] But the

_____

[4] We describe this conduct in more detail below, infra Section III.A.

[5] We affirm this holding, given the plaintiffs' failure to develop an argument for concluding otherwise. See United States

- 11 -

court left open the question of whether Puerto Rico law gives rise to a property interest in adequate water service for paying subscribers for substantive due process purposes.  See id. at *9 ("Neither party cites authority addressing whether PRASA's enabling act or its regulations give rise to a property interest for the purpose of substantive due process and I decline to make that determination here.").  Finally, because it found that the plaintiffs failed to state any legally valid claim, the court did not reach the defendants' alternative bases for dismissal, such as the defendants' various immunity arguments.  See id. at *4.

After de novo review, we hold that the district court erred in concluding that the plaintiffs did not plausibly allege conscience-shocking conduct, including because it failed to account for the possibility that deliberate indifference could shock the conscience.  Because the district court did not resolve whether the plaintiffs have a protected property interest in adequate water service for the purposes of a substantive due process claim, we decline to make that determination in the first instance.  Thus, we vacate the district court's ruling dismissing the plaintiffs' substantive due process claim and remand for further proceedings.

---

v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

## A. Conscience-Shocking Conduct

"If executive conduct does not shock the conscience, the plaintiff has failed to state a constitutional violation and the inquiry ends."  Foote, 128 F.4th at 346.  The district court concluded as much in its ruling.  See Maldonado-Gonzalez, 2023 WL 2601940, at *6.

The plaintiffs argue, however, that the district court erred in its legal analysis of the shocks-the-conscience standard.  First, they claim that the court failed to view their factual allegations in the light most favorable to them in concluding that those allegations "paint a picture of mere negligence, and not of conscience-shocking behavior."  Second, they contend that the court put too much emphasis on whether they had alleged conduct that was physically intrusive.  As we will explain, we agree with the plaintiffs that the district court erred under our modern substantive due process precedent and that they have plausibly alleged conscience-shocking conduct.

Only behavior that is "so egregious, [and] so outrageous . . . may fairly be said to shock the contemporary conscience."  Foote, 128 F.4th at 346 (quoting González-Fuentes v. Molina, 607 F.3d 864, 880 (1st Cir. 2010)).  That is because the shocks-the-conscience requirement serves to separate constitutional substantive due process claims focused on executive

action from tort law.  See Cnty. of Sacramento v. Lewis, 523 U.S. 833, 848 (1998).

To determine whether an official's action rises to a conscience-shocking level, it is helpful to consider a continuum of government conduct, "the bookends of which present the easier cases."  Guertin v. Michigan, 912 F.3d 907, 923 (6th Cir. 2019) (cleaned up) (quoting Range v. Douglas, 763 F.3d 573, 590 (6th Cir. 2014)).  On one end of the continuum is negligent conduct, which is "categorically beneath the threshold of constitutional due process."  Lewis, 523 U.S. at 849.  By contrast, "conduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level."  Id.  In the middle is government conduct that is "more than negligence but 'less than intentional conduct, such as recklessness or gross negligence.'"  Id. (quoting Daniels, 474 U.S. at 334 n.3).  Such cases represent "closer calls."  Id.

Whether government action in this middle range shocks the conscience is "necessarily fact-specific and unique to the particular circumstances."  Doucette v. Jacobs, 106 F.4th 156, 172 (1st Cir. 2024) (quoting González-Fuentes, 607 F.3d at 881) (evaluating whether government officials had been deliberately indifferent to a child's medical needs in the school context in determining whether plaintiffs had created a dispute of material

- 14 -

fact over whether the challenged conduct shocked the conscience). For example, "[w]here government officials must act in haste," only actions intended to cause harm will shock the conscience. Id. (quoting Coyne v. Cronin, 386 F.3d 280, 288 (1st Cir. 2004)). But "[i]n situations where actors have an opportunity to reflect and make reasoned and rational decisions, deliberately indifferent behavior may suffice to 'shock the conscience.'" Rivera v. Rhode Island, 402 F.3d 27, 36 (1st Cir. 2005) (citing Lewis, 523 U.S. at 851-52).

We begin with the plaintiffs' argument that the district court incorrectly concluded that they had alleged only negligent conduct as opposed to deliberate indifference. "To establish deliberate indifference, the plaintiff must show 'at a bare minimum,' that the defendant 'actually knew of a substantial risk of serious harm' but 'disregarded that risk.'" Doucette, 106 F.4th at 172 (quoting Coyne, 386 F.3d at 288) (concluding that plaintiffs had failed to show genuine dispute of material fact about whether school officials had acted with deliberate indifference); see also Guertin, 912 F.3d at 924 ("[T]he type of harm, the level of risk of the harm occurring, and the time available to consider the risk of harm are all necessary factors in determining whether an official was deliberately indifferent." (quoting Range, 763 F.3d at 591)). As the district court rightly noted, because the alleged conduct here took place over several years, the defendants "had

- 15 -

significant time for deliberation." Maldonado-Gonzalez, 2023 WL 2601940, at *6.

Taking the allegations in the complaint as true and drawing all reasonable inferences in the plaintiffs' favor, we conclude that they plausibly alleged that the defendants knew of the water crisis and yet failed to act. The plaintiffs alleged that they had no clean, potable water on most days for over four years, despite raising the alarm to the defendants about the water crisis on an almost daily basis. According to the plaintiffs, at times, all that PRASA needed to do to restore water service to Morovis was to turn on the pumps and/or power generators at PRASA's Morovis facilities. And, on at least one occasion, there was no water service because someone had affirmatively turned off the generator and pumps.[6] Despite the years-long water crisis, the

---

[6] We note that the plaintiffs have waived any claim based on political retaliation. As a reminder, they alleged that PRASA's management instructed employees to shut off water to Morovis in order to sabotage Mayor Maldonado. The district court concluded that although this allegation was troubling, it could not be the basis of a substantive due process claim because a claim of political retaliation must be brought under the First Amendment. See Maldonado-Gonzalez, 2023 WL 2601940, at *5. The plaintiffs did not challenge this ruling on appeal nor did they dispute Pagán's assertion that they waived any such challenge. Given the plaintiffs' waiver, we express no opinion on whether the alleged sabotage could be the basis of a substantive due process claim. See Redondo-Borges v. U.S. Dep't of Hous. & Urb. Dev., 421 F.3d 1, 6 (1st Cir. 2005). That said, because we "assume the truth of all well-pleaded facts" in the complaint, we consider the allegation that PRASA employees intentionally turned off water service to Morovis in our deliberate indifference analysis. Id. at 5 (quoting In re Colonial Mortg. Bankers Corp., 324 F.3d 12, 15 (1st Cir. 2003)).

- 16 -

defendants made no effort to implement any long-term solutions and provided water to the plaintiffs through alternative sources only "a few times." Further, Rivera failed even to investigate who had turned off the power generator and pumps at the Morovis facilities in February 2022.

In addition to plausibly alleging that the defendants were aware of the water crisis, the plaintiffs also plausibly alleged that the defendants knew of the substantial risks of harm that could follow from a sustained lack of water and disregarded those risks. The risks posed by long-term deprivation of potable water are severe and indisputable: water is essential to life, health, and sanitation. See Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 18 (1978) ("Utility service is a necessity of modern life; indeed, the discontinuance of water or heating for even short periods of time may threaten health and safety."). Indeed, it is universally recognized that water and sanitation are critical to human life and health. See G.A. Res. 70/169, The Human Rights to Safe Drinking Water and Sanitation (Dec. 17, 2015) (recognizing, in a resolution adopted by the United Nations General Assembly, human rights to water and sanitation because both are essential to health, life, and human dignity); see also Comm. on Econ., Soc. & Cultural Rts., General Comment No. 15, U.N. Doc. E/2003/22, annex IV (2002) (recognizing a human right to water based in articles 11 and 12 of the International Covenant on

Economic, Social, and Cultural Rights); Comm. on Econ., Soc. & Cultural Rts., Rep. on the Forty-Fourth and Forty-Fifth Sessions, U.N. Doc. E/2011/22, supp. no. 2, annex VI (2011) (similarly recognizing a human right to sanitation). The risk of harm to the plaintiffs is enhanced by the fact that PRASA is the only provider of water service in Puerto Rico. And that risk is particularly severe for the most vulnerable members of the alleged class, including the elderly, people with diseases, and those with children.

In light of the defendants' knowledge of the water crisis in Morovis and the obvious and severe consequences to the plaintiffs, their failure to act over several years is enough to support a claim of conduct that is "so egregious[] [and] outrageous[] that it may fairly be said to shock the contemporary conscience." Foote, 128 F.4th at 346 (quoting González-Fuentes, 607 F.3d at 880). We have previously applied the deliberate indifference framework to evaluate whether government conduct shocks the conscience, even outside of a custodial setting. See Doucette, 106 F.4th at 173-74. And we have previously stated that "[i]t is the effect on the person from the deprivation of the interest in . . . property which may be 'shocking to the conscience,' and perhaps beyond the constitutional pale." Maldonado v. Fontanes, 568 F.3d 263, 272-73 (1st Cir. 2009). The harmful effects of deliberate indifference to an entire

community's lack of clean, potable water for years plausibly qualify as "beyond the pale."

Of course, should this case proceed to discovery, the facts may show that the allegation of inaction by the defendants is untrue or that, in context, the facts amount to at most negligent mismanagement. But, at this stage of the litigation, we conclude that the plaintiffs' allegations support a reasonable inference that the defendants were deliberately indifferent to the risks to the plaintiffs' lives and health. See Guertin, 912 F.3d at 927 (holding that the defendant's decision to turn down opportunities to reconnect the city's water supply to a safe source "after he knew of the significant problems with the [city's] water . . . plausibly allege[d] deliberate indifference").

To the extent the district court concluded that the alleged conduct was negligent and thus "categorically insufficient to shock the conscience," it failed to draw all reasonable inferences in the plaintiffs' favor. Maldonado-Gonzalez, 2023 WL 2601940, at *6. And, to the extent it concluded that only action "intended to injure in some way unjustifiable by any government interest" could qualify as conscience-shocking, the district court misstated the applicable law. Id. (emphasis added) (quoting Lewis, 523 U.S. at 849). As we set out here, we have recognized that less than intentional conduct (i.e., deliberate indifference) may, in context, shock the conscience, even outside a custodial setting.

See, e.g., <u>Rivera</u>, 402 F.3d at 36; <u>see also</u> <u>Lewis</u>, 523 U.S. at 851, 853.

To be clear, we do not suggest that any allegation of interruption in water or utility service would amount to conscience-shocking conduct. Instead, we emphasize that the shocks-the-conscience inquiry is fact intensive. <u>See</u> <u>Pagán</u> v. <u>Calderón</u>, 448 F.3d 16, 32 (1st Cir. 2006). Here, the plaintiffs alleged that the defendants took no action over several years to address a municipality-wide water crisis that left residents without drinkable water, despite near daily outreach by the municipality's residents and leaders and numerous proposed solutions for either mitigating or resolving the crisis.[7] And, they alleged that Rivera failed to investigate whether a PRASA employee deliberately turned off the power generator and pumps in the Morovis facilities despite credible evidence that someone had done so. "When such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking." <u>Lewis</u>, 523 U.S. at 853; <u>cf.</u> <u>Doucette</u>, 106 F.4th at

_____

[7] Despite Pagán's argument to the contrary, the allegation that Pagán told the plaintiffs that "prior to considering [connecting Morovis to the superaqueduct], all other alternatives to try to fix the [water service problem] have to be exhausted" does not cut against finding deliberate indifference. Viewed in the context of the complaint, which alleged that Pagán made no effort to exhaust any alternative, this allegation supports the plaintiffs' contention that Pagán was indifferent to the serious risks posed by inaction.

- 20 -

172-75 (reasoning that school administrators were not deliberately indifferent to a student's risk of seizure because the school was consistently prompt in correcting issues and addressing his parents' safety concerns).

Next, we address whether the plaintiffs had to identify "physically intrusive" conduct to plausibly allege actions that shock the conscience. See Maldonado-Gonzalez, 2023 WL 2601940, at *6. While acknowledging that there has been inconsistency in our older precedent on this issue, we conclude that the district court erred in its analysis on this point.

Our case law does not require that conduct be "highly physically intrusive" to shock the conscience. Id. at *5. Instead, we have suggested that conduct such as requiring bribes, making threats, or acting on racial animus could amount to government action that shocks the conscience. See Clark, 514 F.3d at 113; Mongeau v. City of Marlborough, 492 F.3d 14, 19-20 (1st Cir. 2007) (citing Nestor Colón Medina & Sucesores, Inc. v. Custodio, 964 F.2d 32, 47 (1st Cir. 1992)). At the same time, we have made clear that government officials who simply make wrong decisions or act in excess of statutory authority do not engage in conduct that "crosse[s] the constitutional threshold." Amsden, 904 F.2d at 757 (holding that a state's imposition of a condition on a land surveyor's license did not constitute a substantive due process violation solely because the condition was unlawful under

- 21 -

state law).  Rather, to shock the conscience, government conduct must "run counter to 'the concept of ordered liberty'" or "transgress[]" "some basic and fundamental principle."  Id. at 754 (quoting Palko v. Connecticut, 302 U.S. 319, 325 (1937)).  Thus, depending on the facts, non-physical conduct could qualify as conscience-shocking.[8]

In conducting its substantive due process analysis and contrasting the alleged conduct here with the alleged conduct in Guertin, the district court focused on the issue of physical intrusion.  As the court set out, Guertin addressed the Flint water

---

[8] In reaching its ruling, the district court relied on our decision in Cruz-Erazo v. Rivera-Montanez, 212 F.3d 617, 622 (1st Cir. 2000).  See Maldonado-Gonzalez, 2023 WL 2601940, at *5.  We pause to note that the theory for the substantive due process claim alleged in that case is no longer legally valid.  At the time, we allowed a plaintiff to establish a substantive due process violation without showing any deprivation of liberty or property if they could demonstrate that the conduct at issue shocked the conscience.  See Cruz-Erazo, 212 F.3d at 622.  Applying that standard in Cruz-Erazo, we explained that "the cases in which we have found governmental conduct to shock the conscience have often involved state action that was highly physically intrusive," although we did not foreclose the possibility that non-physical conduct could shock the conscience.  Id.  But under modern substantive due process jurisprudence, plaintiffs bringing substantive due process claims based on executive action "must establish both that [the official's] conduct was conscience shocking and that it violated [the plaintiff's property or liberty interest]."  Wadsworth v. Nguyen, 129 F.4th 38, 52 (1st Cir. 2025).  And, as we have explained, conduct need not be physically intrusive to meet the first requirement.

crisis. See 912 F.3d at 915.[9] In that case, the U.S. Court of Appeals for the Sixth Circuit concluded that the plaintiffs had plausibly alleged a Fourteenth Amendment Due Process violation of their right to bodily integrity because the alleged conduct resulted in the plaintiffs ingesting contaminated water. See id. at 932. In distinguishing Guertin, the district court reasoned:

> The Guertin court found a substantive due process violation because [the alleged conduct] amounted to a forced, involuntary invasion of bodily integrity. Here, no such invasion occurred because PRASA, instead of supplying contaminated water, allegedly has failed to provide any water at all. And, as mentioned, the Guertin court specifically distinguished the failure to provide water from the provision of contaminated water stating that the former did not invade bodily integrity and thus did not violate substantive due process.

Maldonado-Gonzalez, 2023 WL 2601940, at *6 (citations omitted).

The district court's analysis merged the shocks-the-conscience inquiry with the deprivation inquiry, although they are two separate requirements under the substantive

---

[9] In short, the Flint water crisis involved the decision of "public officials [to] switch[] the City of Flint municipal water supply from the Detroit Water and Sewerage Department (DWSD) to the Flint River to be processed by an outdated and previously mothballed water treatment plant" and to "dispens[e] drinking water to its customers without adding chemicals to counter the river water's known corrosivity." Guertin, 912 F.3d at 915. "[W]ithout corrosion-control treatment, lead leached out of the lead-based service lines at alarming rates and found its way to the homes of Flint's residents," resulting in harmful and severe long-term health effects. Id.

due process test for executive action.[10]  The analysis of whether "the failure to provide water" could "invade bodily integrity" would be relevant only if the plaintiffs here had brought a substantive due process claim based on the violation of their right to bodily integrity -- but they did not.  Thus, even if long-term deprivation of water could not plausibly be viewed as physically intrusive, that fact alone should not have been dispositive to the shocks-the-conscience analysis.

Finally, we turn to several waiver arguments raised by Pagán and reject them.  Pagán contends that the plaintiffs waived any challenge to the district court's ruling dismissing the claims against her by failing to develop an argument on appeal that either her conduct or the conduct of the defendants generally amounted to

---

[10] We respectfully disagree with the concurring opinion that we should avoid the overarching issue of whether the plaintiffs have plausibly alleged conduct that shocks the conscience and decide only the narrower issue of whether the plaintiffs have plausibly alleged deliberately indifferent conduct.  Notably, PRASA agreed at oral argument that the plaintiffs squarely put before us the question of whether the conduct alleged was conscience-shocking and even urged us to decide the case on that ground, instead of resolving whether the plaintiffs had alleged a protected property interest.  Thus, it is appropriate for us to decide the overarching issue on appeal.  In reaching our decision, however, we do not tackle other issues that were never raised, either to the district court or to us, including any argument based on Lewis related to the potential role of historical analysis in the shocks-the-conscience inquiry as opposed to the deprivation-of-right inquiry.  We note that our current precedent does not require any such historical analysis, nor did PRASA urge us to modify our precedent by incorporating such an analysis, even though Lewis was decided nearly thirty years ago.  Thus, we leave that question for another day.

deliberate indifference. But in their appeal brief, the plaintiffs pointed us to allegations in their complaint that Pagán specifically knew of the water crisis and delayed taking any action. And their argument as to why the alleged conduct was conscience-shocking -- i.e., that the lack of water is connected to "essential need[s]" -- applies with equal force across all the defendants. Thus, we conclude the plaintiffs did not waive their substantive due process claim against Pagán.

Similarly, we cannot agree with Pagán's broader assertion that the plaintiffs failed to brief, "and, indeed [did] not even mention" deliberate indifference on appeal. The plaintiffs cited the applicable standard for deliberate indifference, stating that "[i]n situations where actors have an opportunity to reflect and make reasoned and rational decisions, deliberately indifferent behavior may suffice to 'shock the conscience.'" (Quoting Rivera, 402 F.3d at 36.) And, relying on a case involving allegations that the deprivation of sufficient water to prisoners constituted deliberate indifference that shocked the conscience, the plaintiffs argued that the "hygiene issues associated [with] the lack of water" could amount to a constitutional violation. (Citing Hardeman v. Cnty. of Lake, No. 17-cv-8729, 2018 WL 3533254 (N.D. Ill. July 23, 2018), aff'd sub nom., Hardeman v. Curran, 933 F.3d 816 (7th Cir. 2019).) Of course, the plaintiffs at several points also made the more general

argument that the alleged conduct was so egregious as to shock the conscience, and they could have done even more to apply our deliberate indifference case law to the facts here. Still, the plaintiffs' claim that the defendants' conduct shocked the conscience is clearly before us, and thus we must apply the correct legal standard in resolving that claim. See Foote, 128 F.4th at 347 n.13.

Because we conclude that the district court erred in its shocks-the-conscience analysis, we vacate its ruling dismissing the plaintiffs' substantive due process claim. In doing so, we do not reach issues unaddressed by the district court. Thus, we leave the second inquiry required to evaluate the plaintiffs' substantive due process claim -- whether the plaintiffs were deprived of a protected property interest -- to be decided by the district court in the first instance, with the benefit of focused argumentation on this potentially dispositive issue.[11]

---

[11] As a reminder, the plaintiffs argue that Puerto Rico law creates a constitutionally protected property interest in adequate water service for paying subscribers, relying primarily on procedural due process cases. In response, the defendants argue that Puerto Rico law does not create a property interest for substantive due process purposes, and they urge this defense as an alternative ground for affirming the district court's judgment dismissing the complaint. As the plaintiffs acknowledge, substantive due process does not "embrace all state-created property interests entitled to procedural due process protection." Santiago de Castro v. Morales Medina, 943 F.2d 129, 131 (1st Cir. 1991). Accordingly, procedural due process cases may be relevant to whether a property interest exists under state law, but they are not dispositive of whether that property interest creates

## B. Qualified Immunity

Pagán urges us to affirm the district court's ruling dismissing all claims against her in her personal capacity on other grounds, arguing that she is entitled to qualified immunity. The district court did not reach Pagán's qualified immunity defense because it ruled that the plaintiffs had failed to state a claim under Rule 12(b)(6). See Maldonado-Gonzalez, 2023 WL 2601940, at *4. We decline to resolve Pagán's qualified immunity claim in the first instance and remand to the district court to evaluate her arguments.

## IV. CONCLUSION

For all these reasons, we **<u>vacate</u>** the district court's ruling dismissing the plaintiffs' substantive due process claim and **<u>remand</u>** to the district court for further proceedings consistent with this opinion. The parties shall bear their own costs.

### - Concurring/Dissenting Opinion Follows -

---

substantive due process rights. See Figueroa-Serrano v. Ramos-Alverio, 221 F.3d 1, 6 (1st Cir. 2000) ("The Constitution does not create property interests; instead, 'they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law . . . .'" (quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972))); see also Town of Castle Rock v. Gonzales, 545 U.S. 748, 757 (2005) ("Although the underlying substantive interest is created by an independent source such as state law, federal constitutional law determines whether that interest rises to the level of a legitimate claim of entitlement protected by the Due Process Clause." (emphasis omitted) (internal quotation marks omitted) (quoting Memphis Light, Gas, & Water Div., 436 U.S. at 9)). We leave the district court to address the state law property interest argument on remand, if it reaches this issue.

**BARRON, Chief Judge, concurring in part and dissenting in part.** I agree that the plaintiffs have plausibly alleged that the defendants were deliberately indifferent rather than merely negligent in failing to respond to the persistent lack of water service in their community. So, I agree that the District Court erred when it dismissed the plaintiffs' substantive due process claim on the ground that the conduct alleged in the complaint amounted to mere negligence. I write separately to explain why I would not go on to decide that the plaintiffs, by plausibly alleging deliberate indifference, have also plausibly alleged conduct that shocks the conscience. See Cnty. of Sacramento v. Lewis, 523 U.S. 833, 847 n.8 (1998) ("[I]n a [substantive] due process challenge to executive action, the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.").

In general, it is prudent to avoid unnecessarily resolving novel constitutional questions. Nw. Austin Mun. Util. Dist. No. One v. Holder, 557 U.S. 193, 197 (2009). In my view, the question of whether this alleged deliberate indifference is conscience-shocking is both novel and unnecessary to decide at present.

The question arises in a context that differs from the paradigmatic one for deeming deliberate indifference to be

- 28 -

conscience-shocking.  See González-Fuentes v. Molina, 607 F.3d 864, 883 (1st Cir. 2010) ("The Supreme Court's hypothetical archetype for a successful deliberate indifference claim is an individual taken into state custody who is then denied basic human needs . . . .").  It also arises in a context that raises issues of first impression about the degree to which the federal constitutional guarantee of due process requires courts to police failures to provide municipal services.

We also could easily vacate the order of dismissal on the ground that the complaint alleged more than mere negligence. We thus could easily leave the question of whether the alleged deliberate indifference is conscience-shocking to the District Court to address in the first instance.

This wait-and-see approach seems especially prudent to me because it is not clear that, if we were to adopt it, the question now before us would ever need to be addressed at all. The plaintiffs concede that they must allege a protected interest in property for their substantive due process claim to survive a motion to dismiss.  Thus, they do not dispute that, unless they can do so, the constitutional question at hand will have no bearing on whether the complaint can survive the motion.

In any event, if a follow-on appeal were to present this same question, we might have then what we now lack -- some meaningful assistance in thinking through whether the deliberate

indifference alleged is conscience-shocking. That assistance would be especially welcome, given that a proper determination of whether the alleged deliberate indifference shocks the conscience may depend in this context on a historical inquiry that, needless to say, has not yet been undertaken by either the parties or the District Court. Cf. Lewis, 523 U.S. at 847 n.8 (explaining that the "judgment" of "whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience . . . . may be informed by a history of liberty protection"); see also Hawkins v. Freeman, 195 F.3d 732, 738 n.1 (4th Cir. 1999) (noting that "[w]hat is not perfectly clear [from Lewis] . . . is the extent to which this threshold [shocks-the-conscience] test is to be applied independently of any consideration of what relevant history, tradition and precedent may have to say about the asserted right and its protection," and ultimately "assum[ing] that courts seeking faithfully to apply the Lewis methodology in executive act cases properly may look to history for whatever it may reveal about traditional executive practices and judicial responses in comparable situations by way of establishing context for assessing the conduct at issue").

To be sure, the majority appears to hold that the appellees have waived any such history-based argument. But I would leave it for the District Court to take the first pass at addressing who may have waived what in that regard, just as I would

leave it for the District Court to do so when it comes to determining whether the alleged deliberate indifference shocks the conscience.